[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for dissolution of marriage on the grounds of irretrievable breakdown brought by the plaintiff wife against the defendant husband. The parties appeared at trial, testified, and presented witnesses. The parties and the attorney for the minor children presented written claims for relief. The parties submitted voluminous documentary evidence, much of it relating to financial issues. The court observed the demeanor of the parties and witnesses and evaluated their credibility. Principally at issue are financial matters and parenting claims. However, the court will also consider the husband's motion seeking to have the wife held in contempt for violation of the automatic orders. Based upon the evidence and the inferences reasonably drawn from it, the court makes the following findings of fact.
 1. FINDINGS OF FACT
The wife, whose birth name was Marinella LaCaprucci and whose name at the time of the marriage was Marinella Diaz, was married CT Page 11114 to the husband on December 31, 1988 in Hartford, Connecticut. One child, Marina DeMarco, born on January 22, 1981, was a product of the wife's prior marriage, but was adopted by the husband during this marriage after her birth father voluntarily terminated his parental rights. A second child, Taylor, was born to the parties on June 25, 1991. The court has jurisdiction and all statutory stays have expired. The marriage of the parties has broken down irretrievably.
The parties first met in September, 1981 when the wife was approximately twenty-four and the husband was approximately forty-six. The wife's divorce from Jose Diaz was filed in October, 1981 and went to judgment in January, 1982. By February, 1982, the husband and wife had formed an exclusive relationship. They lived together intermittently until 1984 or 1985, when the husband moved into a house the wife had earlier purchased and occupied on Tee Lane in Wethersfield, and lived together there until April, 1998, when the husband left. Since he left, he has not seen Marina, but the parties have had a shared parenting plan for Taylor.
The wife, now forty-two, has had a very successful business career which began before the marriage and has continued until now. At the time of the marriage, she worked in facilities management for the Aetna Insurance Company, where she had been employed for about six years. She continued to perform the same kind of work there until 1992, when she was terminated. She received one year's severance pay, and netted $40,000.00 from a lawsuit she initiated as a result of circumstances surrounding her termination. The $40,000.00 was put aside for Taylor's education. After leaving Aetna and taking some time off, she worked for a short period at a private property management company before beginning her own property management company, DeMarco, Miles and Murphy, of which she is now president. Her current salary is approximately $82,000.00 per year, a decrease of approximately $20,000.00 from her 1998 income because of the company's loss of accounts which had generated approximately $200,000.00 in annual revenues.
For most of his life, the husband worked in the remodeling business but did not report his income, or at least all of it, for federal income tax purposes. Between 1985 and 1991, the husband had no reported earnings. Over the ensuing three years, his reported earnings totaled $7,764.00, including $143.00 for 1992.[1] He characterized his efforts as hustling for small CT Page 11115 jobs. His testimony that he made little or no money from this work over a ten year period during the marriage is utterly lacking in credibility,[2] except to the extent that he admitted making money he did not report. In the mid-1990's, the husband began regular employment at DeMarco, Miles, and Murphy as a maintenance supervisor assigned to a property managed by the company. He earned $36,986.00 in 1995 and $35,992.00 in 1998, with similar amounts during the intervening years. He was fired early in 1999 for falsifying the time records of an employee whom he had ordered to spy on Mrs. DeMarco during work hours. He is now collecting unemployment of $372.00 per week. The husband has had knee operations and has other medical conditions which he claims impair his ability to work, but is able to play golf regularly. Based upon the husband's testimony, which the court finds is credible on this issue, the court finds that he could have continued to work at DeMarco, Miles, and Murphy at least until his seventieth birthday[3] had he not been fired for his improper conduct.[4] Accordingly, based upon all the evidence, the court finds that he has an earning capacity of $35,000.00 per year.
The parties each claim some degree of contribution to the acquisition of the assets that appear on their financial affidavits. When the parties first met, the wife had several assets. The financial affidavit filed in connection with her 1982 divorce listed two income properties having a total equity of $18,000.00 (of which $6,500.00 was her mother's) and generating income of $78.00 per week. She was earning $23,000.00 at Aetna, and her pension there was worth $6,000.00. None of this property was given to her former husband in the divorce. Two years after the divorce, but before this marriage, the wife sold the house on Sargeant Street for a price in the $80,000.00 range, and sold the house on Victoria Road that she owned with her mother for what she estimates as a similar price.[5] The wife had approximately $55,000.00 in assets in 1982. Except for the pension, most of those assets were used when she purchased the Tee Lane house in 1983 for $110,000.00, subject to a sixty thousand dollar mortgage.[6] The husband's pre-marital assets are more simple. He owned a house acquired in 1968 during his first marriage. The house, located in East Hartford, sold in 1986 for $105,000.00, of which Mr. DeMarco netted $77,000.00.[7] Prior to the sale of his house, the husband did not have any significant liquid assets. He could not, for example, have contributed to the purchase of the Tee Lane house if he had been asked to do so. Thus, the parties had nearly equivalent assets at the time of the CT Page 11116 marriage.
The wife's financial affidavit includes the following values for significant current assets:
1. Real property
 5 Tee Lane, Wethersfield $120,792.00 24 High Hill Ln., Canton 100,000.00 Hawaii timeshares 3,000.00 Vermont Timeshares 1,500.00 ----------- Sub-total $225,292.00
2. Deferred compensation
 Aetna ISP $179,688.00 Aetna annuity 281,889.00 Misc. annuities 21,906.00 ----------- Subtotal $483,483.00
3. Miscellaneous
 Son's UGMA $85,273.00 Minority interest in DeMarco, Miles unknown
The husband lists some of the same assets, but values some of them differently. He values the Tee Lane house at $240,000.00, and estimates the mortgage to be only $40,00000. The result is that by his valuation, the equity in the house is $200,000.00, whereas by the wife's valuation the equity is $120,792.00. The wife's estimate of value is based upon an appraisal she had completed several years ago, and the court finds that the husband's estimate of the value of the house is more credible. However, the wife has always paid the mortgage, and is more likely to know the current balance. The court finds that the wife's determination of the debt of the mortgage is more credible. Accordingly, the court finds that the house is worth $240,000.00, less a mortgage of $95,209.00, for a total net value of $144,791.00. The husband also lists the Aetna annuity as part of his financial affidavit, but does not include its value in the total of his assets. Finally, he has $34,282.00 in other liquid assets with this finding concerning the value of the house. The court finds that the combined marital assets of the parties is CT Page 11117 $829,065.00, exclusive of automobiles and personal effects.
One of the more important issues in this case has to do with the interplay between a sum of money slightly less than sixty thousand dollars paid by the husband to the wife and the ownership of the Tee Lane house and the Aetna annuity. The husband claims that he gave the wife sixty thousand dollars so that she could pay off the mortgage, refinance, and use the proceeds to purchase the Aetna annuity, which he claims was to provide for his retirement. He also claims that the annuity was purchased so that he could retire early and take care of his son. The wife acknowledges the transfer of the funds, but claims that the money was a gift so that she could make an investment, that the husband was paid by receiving a half interest in the house, that the annuity was bought for the daughter's post secondary education, and that the husband was originally named as annuitant solely to permit the wife to withdraw money without tax consequences.
The court finds that on March 17, 1989 the husband paid $57,338.78 to the Bank of Hartford to extinguish the first mortgage the wife had placed upon the Tee Lane house when she purchased it. Those funds were a portion of the money he received when he sold his own house. At that time, the Tee Lane house was worth $300,000.00. At about the same time, the wife quit-claimed a half interest in the house to the husband by a deed recorded on March 16, 1989, according to his checkbook. In effect, he received $150,000.00 for his contribution, while the wife's equity declined by $90,000.00. On May 24, 1989, the parties mortgaged the property. There is no direct evidence of the amount of that mortgage, but it is reasonable to infer from the evidence that the mortgage was approximately $140,000.00. More than a year later, on June 8, 1990, the wife purchased a single premium annuity from Aetna for $140,000.00, naming herself as the contract owner and the husband as the annuitant. The present annuitant is the daughter. Funds from the remortgage were used to purchase the annuity, and the remortgage diminished each party's equity by at least seventy thousand dollars.[8] That mortgage was released on March 11, 1992, and replaced with the present mortgage to New Haven Savings Bank.
The annuity has a value of $281,889.00. It can be surrendered without a surrender fee for payment of its entire cash value, less any applicable taxes. In the alternative, the annuitant can elect to receive monthly income. If Mr. DeMarco were the CT Page 11118 annuitant, for example, and chose to receive lifetime income on the whole annuity, he could receive $967.00 per month. Other choices concerning the terms of receipt of funds are available to both parties, and each choice affects the amount of money that would be received monthly. The husband is not credible in his testimony of why the annuity was purchased. He testified that it was purchased so that he could retire[9] and stay home to watch over his son. His son, who was born on June 25, 1991, was not conceived when the annuity was purchased a year earlier. While the parties were hoping for a child, the husband having had a surgical procedure done earlier to attempt reversal of a vasectomy he had undergone, they could not have had, at the time the annuity was purchased, the precise information about which the husband testified. The court finds that the annuity was purchased as an investment for the benefit of the family unit.
The wife also owns a house in Canton which was purchased shortly before trial without notice to the husband.[10] The method of purchase illustrates the financial techniques employed by the wife. The contract price for the house was $275,000.00, but the actual price was $260,000.00 because of accommodations the wife received from the seller and on account of rebated real estate commissions. The mortgage is $175,000.00. The $85,000.00 down payment was accumulated by a $30,000.00 loan from her company,[11] cash she received from her mother, $20,000.00 in cash she received from Ray Esposito, father of her business partner,[12] sums from her children's accounts, and cash of approximately $8,000.00 from money she kept in her house.[13]
The wife also controls or has controlled various investments for the children. The largest of these is a Uniform Gift to Minors Act ("UGMA") account for Taylor valued at $85,273.00, which was the account purchased with the proceeds of her action against Aetna. There is no evidence that she ever used funds from this account for her own purposes. The contrary is true of other assets held in the name or for the benefit of the children. During the pendency of this lawsuit she took $7,500.00 from accounts benefitting [benefiting] Marina and Taylor to pay a portion of her legal fees. After the dissolution commenced, she transferred $12,000.00 from her own funds to a money market for Taylor, and that money market does not appear on her financial affidavit. Nearly $5,000.00 of the down payment for the Canton house came from an account held by the wife in joint tenancy with the daughter. The daughter has $42,000.00 in Series EE savings bonds which do not appear on the wife's financial affidavit.[14]
CT Page 11119
The final asset meriting extensive discussion is the wife's interest in DeMarco, Miles, and Murphy. It was begun when she and three others each invested $5,000.00. One of the three, Neal Esposito, is an inactive participant who shares in profits but does not work at the business. The other two and the wife work full time at the business. Each takes a similar salary, each has a similar expense account, and all three are covered by a similar $250,000.00 key person life insurance policy. of the $250,000.00, $50,000.00 is allocated to a repurchase by the company of the partner's stock, while the remaining $200,000.00 is allocated to compensate the company for the loss of the partner as a key employee. The company has $100,000.00 in available cash (in addition to the $30,000.00 loaned the wife) and $200,000.00 in accounts receivable, of which $100,000.00 to $150,000.00 have been outstanding less than ninety days. The company's total assets are $449,000.00. In short, it is a valuable company. While there is no direct evidence of its precise value, and the wife was not sure she would sell her interest in it for the $50,000.00 represented by the stock repurchase plan, it is clear that if she were to die she would only receive that $50,000.00 for her stock. The court finds that amount to represent the value of her interest in the company. While the firm may have a value in excess of $200,000.00, representing all partner's interests by this valuation, a substantial portion of the value derives from the presence there of Ms. DeMarco, Ms. Miles, and Mr. Murphy. They value their contribution to the company's worth based on their work alone at $200,000.00 each. Without Ms. DeMarco's active participation, the value of the enterprise would diminish. Ms. DeMarco has an extensive background in property management that pre-dates both the marriage and the inception of the business. Her efforts contributed to its value. Mr. DeMarco, in contrast, contributed nothing to the value of the business. Rather, he discouraged the wife's efforts to begin it, and after working there for only a few years, he was fired for defrauding the company and causing one of his subordinates to act disloyally toward it and one of its owners.
Although Marina is now eighteen and not subject to orders regarding parenting, the court cannot consider the best interests of Taylor without considering the history of the relationships among the entire family. Marina was adopted by the husband at about the time that Taylor was born, but her relationship with the husband began during her infancy. In effect, he was the only father she has known. According to Mr. DeMarco, their CT Page 11120 relationship was positive until Marina entered adolescence. She began to resist the husband's methods of discipline, which were methods the wife did not support. According to Mrs. DeMarco, the husband's difficulties with Marina began earlier, near the time when Taylor was born, when the husband became mean, angry, and spiteful to both the wife and Marina. The husband's relationship with the daughter became verbally abusive during her adolescence. The daughter became depressed and attempted suicide when she was in the seventh grade. She has not yet finished high school, although she was scheduled to graduate this year, and is enrolled in a special education program. She continues to receive medical care for depression. The husband has had no contact with the daughter for more than a year, although part of that is attributable to the suggestion of the daughter's attorney. He has not had an effective parent-child relationship with her for approximately six years. This fact is significant when viewed in the context of his promise that he will continue to "be there" for Taylor.
Taylor is described as a bright, happy child who performs very well in school. He wants to spend time with both his parents, whom he equally loves and who both love him. Both parents contributed to Taylor's care when they were living together, and both have done so under a shared parenting plan since the separation. Taylor has few friends. During the last two years, he has experienced a significant weight gain, and is substantially overweight. The children's attorney presented evidence from Frederick Hatfield, Ph.D. concerning Taylor's obesity and fitness as well as some of Taylor's medical records. Dr. Hatfield's claim to be a "sports psychologist" is without credibility, but he is found to be competent to testify as an expert concerning the relationship between weight and physical fitness and to the child's increases in weight as charted by the child's pediatrician on a height/weight chart. While the child's height has been within normal limits for his age, his weight greatly increased over the past two years, and is above normal limits. Between April 30, 1998 and March 29, 1999, his weight increased from seventy one pounds to ninety pounds, an increase of nearly twenty-seven percent. He is above the ninety-fifth percentile in weight for his age, a point at which referral to a physician should be considered. The court cannot attribute Taylor's obesity to either parent exclusively, but finds that both parents' acquiescence in Taylor's sedentary lifestyle is a significant factor. The husband is unable to play rigorous games with the child, but not through any fault on his part. However, CT Page 11121 the husband has not done certain things to encourage a more active lifestyle in his child. For example, Taylor aspires to be a professional golfer, and the husband has always been an avid one. There is no evidence that the husband has ever attempted to play golf with Taylor. Similarly, when one of Taylor's school mates called to ask the boy over to play, the husband acquiesced when Taylor did not want to go. The wife does little personally to facilitate a more active lifestyle for Taylor, either, although she has undertaken some efforts to enroll him in soccer and swimming programs. Her more important contribution to Taylor's weight problem is to control his diet.[15] In short, despite the effort expended by the parties to show whose fault it is that Taylor is overweight, the court does not find either substantially less at fault for that problem, although the wife has addressed the issue somewhat better.
The court finds that it is in the best interest of the child that the parents have joint legal custody of him, and that he be enabled to spend substantial time with both. This finding is based in large part upon the evidence that the child loves and needs both of his parents. The court is concerned that the parties do not communicate effectively regarding Taylor, not simply because effective communication is essential for joint legal custody but also because the absence of it places the child at risk for being the victim of continuing stalemates regarding parenting issues. The court finds that it is in the best interest of Taylor that the wife be the primary parent to make decisions concerning his health, social and educational needs, but that the husband be given the opportunity to participate in those decisions as well as access to all records concerning the child. The court finds that it is in the best interest of the child that his primary residence be with the wife, subject to liberal and expansive visitation as set forth in the orders the court will make.
The court finds that both parties lack credibility in crucial areas of their testimony. The husband lacked credibility concerning his earnings history, the reasons for the purchase of the annuity, and his contribution to the maintenance and improvement of the marital home. The wife lacked credibility in her testimony concerning the daughter's bonds, her own cash, and the funds for the acquisition of the Canton house. She testified that she had transferred $12,000.00 of her fund to a money market account for Taylor but did not include that account on her financial affidavit. In reaching its findings, the court was CT Page 11122 required to evaluate each issue and each piece of evidence separately in light of the other facts presented, rather than attempting to rely principally on the credibility of either party. While both sometimes testified credibly, each sometimes did not.
The wife attributes the husband's verbally abusive and controlling behavior as the cause of the breakdown of the marriage. The husband attributes the wife's business success and her attitude toward his advancing age as the cause. The court finds that both are right. The husband ceased to continue to grow during the marriage, and was not making much of a financial contribution. Meanwhile, the wife became ever more successful. The husband became verbally abusive. Although the primary target of his anger was the parties' adolescent daughter, the wife did not escape it. Moreover, his behavior toward the daughter affected his relationship with the entire family. The wife began to remove herself from his life, all the while developing a rich and involved life for herself.[16]
 2. DISCUSSION
There are five principal issues to be decided in this case: whether any or all of the property held for the children constitutes part of the marital estate; property division; alimony; child support; and whether the plaintiffs financial activities during the pendency of the action constitutes contempt of the automatic orders to which the parties were subject upon the commencement of the action. The first two require an analysis of what constitutes property. "There are three stages of analysis regarding the equitable distribution of each resource; first, whether the resource is property within Section 46b-81 to be equally distributed (classification); second, what is the appropriate method for determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties." Krafick v. Krafick,234 Conn. 783, 792-93 (1995). In addition, property division, alimony, and child support require analysis under the statutes which govern awards concerning them. Connecticut General Statutes, Sections 46b-81, 46b-82, and 46b-84. The court is not required to make explicit reference to the statutory criteria it considered in making its decision or to make express findings as to each statutory factor. Caffe v. Caffe, 240 Conn. 79, 82-83
(1997). CT Page 11123
 A. Children's Accounts
The husband contends that the funds held in the name of the minor children are marital assets subject to distribution as property. In support of this contention, he cites Salvio v.Salvio, 186 Conn. 311 (1982), which held: "In the absence of any unequivocal act by the defendant rendering the savings account trusts irrevocable or otherwise transferring ownership rights to the beneficiaries, we conclude that [the children] held no beneficial interest in the accounts at the time of the dissolution of their parents' marriage." Id., at 323.
The wife holds $85,273.00 in a Uniform Gift to Minors account for the minor child. Assets held under the provisions of that statute are the property of the minor, and their transfer to the minor is irrevocable. Connecticut General Statutes, Section45a-558h(b). Accordingly, funds held in a Uniform Gift to Minors Act account are not covered by the rule in Salvio.[17]
The funds in the account held by the wife for Taylor derived from the proceeds of the wife's lawsuit against her former employer, and have been held in accordance with the requirements of the statute. Accordingly, the court will not treat that account as a marital asset.
Other sums held by the wife for the purported benefit of the parties' children have been used by the wife for her own purposes. She used some of the money set aside for the children for the purchase of the Canton property and for the payment of attorney fees in this action. Some of the accounts from which that money was taken do not appear on the wife's financial affidavit. However, to the extent that the amount of those assets has been proven, they must be treated as marital assets.
 B. Contributions to Assets
In dividing marital property, one of the factors that the court is obligated to consider is the contribution of the parties to the acquisition of the assets. Connecticut General Statutes, Section 46b-81(c). Where, as here, one of the parties has been the primary earner and saver, the court must also consider the contributions of the other spouse.
 A property division ought to accord value to those nonmonetary contributions of one spouse which enable the CT Page 11124 other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in property division incident to the dissolution of marriage. . . . [A]n equitable distribution of property should take into consideration the . . . contributions to the marriage, including homemaking responsibilities and primary caretaking responsibilities.
 O'Neill v. O'Neill, 13 Conn. App. 300, 311, cert. denied,207 Conn. 806 (1988). While the court in O'Neill was specifically faced with analyzing the contributions of the wife, who primarily remained at home, it is clear that any analysis of economic or non-economic contributions must be gender neutral.
In this case, the wife was the primary earner. Throughout the marriage, even when the husband was working on the books, she earned considerably more than he did. In addition, in large measure because of her early poverty, she was determined to save as much as possible, and her investment decisions and strategies were responsible for all the savings the parties have attained. Apart from the husband's contribution of nearly $60,000.00 to pay off the original mortgage of what was originally the wife's house, the husband's financial contributions were minimal. While the wife's testimony that "he never bought a diaper" was hyperbole, the husband's regular financial contributions were not overwhelming. Between June 9, 1995 and May 8, 1996, for example, his financial contributions to the household were approximately $11,000.00, including payments for utilities, newspapers, day care, and car taxes.[18] During that period, he was earning more than $35,000.00 per year from his employment at DeMarco, Miles, and Murphy and carried a balance of between $10,000.00 and $25,000.00 in his checking account. Between May of 1996 and February of 1997 he contributed a bit more than $7,000.00 for such things, although his earnings remained approximately the same.
In evaluating the husband's non-monetary contributions to the marriage, the court has considered both the positive contributions he made and those behaviors which were more negative. For a number of years prior to leaving the home, he was primary caregiver to Taylor during the later afternoons, while the wife attended to the children during the mornings. He also contributed to repairs and maintenance around the house. However, after his mother's death and during Marina's adolescence, he CT Page 11125 became angry, spiteful, and verbally abusive, causing difficulties to his daughter and dissension in the home.
The husband correctly reminds the court that decisions concerning property division and alimony must be made without regard to gender. The statutes and case law require that courts treat divorce litigants as parties, not as men and women. See,O'Neill v. O'Neill, supra at 310. In this case, the husband implicitly invites the court to treat him as though he were a wife who stayed at home to raise the children and keep the house so that her husband would be free to earn and save more successfully. While the court must be gender-blind, however, it must also base decisions on the facts presented by each case. Here, the husband worked throughout the marriage. Sometimes, with the consent and cooperation of the wife, he did not report his income. Sometimes he did. In either case, however, he did not remain home to cook, clean, and raise the children, and he did not contribute most of what he made to the maintenance of the family. He made both financial and non-financial contributions to the family, but neither was disproportionately large, neither required that he sacrifice preferred activities, and neither was as great as he was capable of making.
 C. Contempt
When the wife filed the action, both parties were ordered to comply with the automatic orders which issue upon the commencement of it. Among the orders, which apply to both parties, are the following:
 1. Neither party shall sell, transfer, encumber, conceal, assign, remove, or in any way dispose of . . . any property, individually or jointly held by the parties, except in the usual course of business . . . or for reasonable attorney fees in connection with this action.
 2. Neither party shall incur unreasonable debts hereafter, including but no (sic) limited to . . . further encumbrancing any assets. . .
These orders are made by the court pursuant to Practice Book Section 25-5 and served with the complaint. The wife has done several things since the commencement of the action which are claimed to be a violation of the orders. First, using funds which CT Page 11126 were purportedly set aside for the children, she made a payment of $7,500.00 to her attorney. Secondly, she used cash of approximately $35,000.00 including money purportedly owned by her daughter for the purchase of the Canton house, and incurred $225,000.00 in debt. The purchase was orchestrated to prevent the husband from gaining knowledge of it.
The wife's use of $7,500.00 for attorney's fees during the existence of the automatic orders does not constitute contempt of them. That those are reasonable fees is established in part by the court order granting the husband an allowance of $5,000.00 for his own fees and in part by the undeniable complexity of the case. However, her spending and borrowing in connection with the purchase of the Canton house cannot be viewed as anything but a contempt. "A civil contempt can involve a willful failure to comply with a then outstanding court order." Marcil v. Marcil,4 Conn. App. 403, 405 (1985). "To find a person in contempt, a trial court must conclude that a party has disobeyed an order of the court. `"Contempt is a disobedience to the rules and orders of a court which has the power to punish for such an offense."'"Fitzgerald v. Fitzgerald, 16 Conn. App. 548, 551 (1988).
 3. ORDERS
The court has considered the relevant statutory criteria contained in Sections 46b-62, 81, 82 and 84, together with applicable case law and the evidence in the case. Based upon all these considerations, the court makes the following orders:
1. The marriage of the parties, having broken down irretrievably, is hereby dissolved.
2. The wife shall keep her interest in DeMarco, Miles, and Murphy free of any claim by or interest in the husband.
3. The wife shall keep her interest in the real property located at High Hill Lane in Canton free of any claim by or interest in the husband.
4. The wife shall irrevocably maintain for the benefit of Taylor DeMarco the Uniform Gift to Minors account in the amount of $85,273.00 in accordance with the requirements of the Uniform Gift to Minors Act.
5. Each party shall receive within ten days one half of the CT Page 11127 sum remaining from the $12,000.00 which the wife transferred from her funds to a money market for Taylor DeMarco during the pendency of this action. If there is less than $12,000.00 remaining in that account, the wife shall account for the difference within thirty days. The court will retain jurisdiction to make further decision to implement the orders regarding these sums, if necessary. Any attorney fees incurred by the husband to obtain his share of these funds will be paid by the wife if those fees are made necessary by her failure to make either the payment or the accounting.
6. The wife shall transfer to the husband her entire interest in and to the real property located on Tee Lane in Farmington, Connecticut. The husband shall hold her harmless and indemnify her for all mortgages presently on the property and for any taxes, fees, usage charges, utilities, and similar charges that accrue from the date of this judgment forward.
7. As security for the indemnification provisions set forth in the preceding paragraph, the husband shall pay to the wife $1.00 per year as alimony, which shall terminate on the death of either party or the sale by the husband of the real property free of debts, but shall not otherwise terminate, and which shall be modifiable only if the husband fails to indemnify the wife or hold her harmless on the debts and charges set forth in the preceding paragraph.
8. The wife shall transfer to the husband all her interest in the Hawaii timeshares, and the husband shall transfer to the wife all his interest in the Vermont timeshares.
9. The parties shall keep the vehicles shown on their financial affidavits.
10. The wife shall maintain her $100,000.00 life insurance policy listed on her financial affidavit, and shall name the husband as beneficiary on the policy in an amount equal to the alimony award so long as alimony under this judgment remains unpaid.
11. The husband shall keep the checking and savings accounts, individual retirement accounts, and the share certificate set forth on his financial affidavit. He shall name the child irrevocable beneficiary of the retirement accounts as long as he has an obligation to pay child support, but that requirement CT Page 11128 shall not prevent him from receiving retirement benefits from the accounts when he is eligible to do so.
12. Except as otherwise set forth in this judgment, the wife shall keep her Aetna ISP, her Aetna annuities, her IRA's, and her Aetna pension, together with the bank accounts she has listed on her financial affidavits.
13. The wife shall transfer to the husband thirty percent (30%) of the Aetna annuity listed on her financial affidavit as being valued at $281,889.00, and he shall thereafter have any of the contract rights with respect to that share as an owner of it. The wife shall retain and shall be owner of the remaining seventy percent (70%) of this Aetna annuity with all the contract rights with respect to that share of it.
14. The wife shall pay two thirds of the attorneys fees of the attorney for the minor child through trial within thirty days hereof, and the husband shall pay one third of the attorneys fees of the attorney for the minor child through trial within thirty days hereof.
15. Each party shall be liable for the debts listed on their respective financial affidavits, except that the husband shall be liable for the mortgage on the Tee Lane property as set forth herein.
16. The parties shall have joint legal custody of the minor child. The wife shall have primary decision making authority for all decisions regarding the medical treatment, education, and extracurricular activities for the child. The husband shall have complete and unimpeded access to the child's medical and school records as well as to any other records generated for the child. He shall be informed immediately of any serious medical treatment or educational difficulty involving the child. He shall have the right to participate fully in all school conferences, medical consultations, and similar activities. Both parties will foster in the child a respect and affection for the other parent, and neither party shall make any disparaging comments about the other in the presence of the child or in a manner which would be likely to bring those comments to the child's attention. Neither party will discuss this decision or any matter relating to the litigation of this case with the child, now or during his minority. CT Page 11129
17. The child shall reside primarily with the wife. The husband shall have parenting responsibilities for the child on alternate weekends from Friday after the conclusion of the child's school and extracurricular activities or after the husband's work hours until Sunday at 6:00 p. m. during the school year or Sunday at 8:00 p. m. during school vacations. Whenever there is a school holiday on a Friday or a Monday, the parent who has the child on the corresponding weekend shall have the child. The husband shall have parenting opportunities with the child on Tuesday and Thursday evenings from the time the child completes school and extracurricular activities, which will be until 8:00 p. m. on days followed by a school day and which will be overnight on one of the two weekdays during school vacations. The party with whom the child is spending time will be responsible for ensuring that the child attends his regularly scheduled extracurricular activities. Each party will be entitled to talk with the child for a reasonable period each day by telephone. Until the husband resumes work, he will be responsible for transporting the child to and from the child's school or the wife's house for visitation. When he notifies the wife that he has resumed work, the parties will arrange for equitably sharing the transportation responsibilities related to visitation. If they are unable to agree, they will submit the matter to family relations for mediation. If they are still unable to agree, they will return to court for further orders. The court will retain jurisdiction. If either party is unable to care for the child for a period in excess of four hours during his or her parenting time, the other will be given the right to have the child for that period.
Notwithstanding the order regarding Monday and Friday school holidays set forth above, the parties shall alternate Easter, Memorial Day, July Fourth, Labor Day, Thanksgiving including the Friday after Thanksgiving, Christmas Eve, Christmas Day, and New Year's Day, with the husband having Easter, July Fourth, Thanksgiving, and Christmas Day in even numbered years and the other holidays being arranged accordingly.
Each parent shall have the child for two uninterrupted weeks during the child's summer vacation.
If either party travels out of state with the child for more than one overnight, the other party shall be informed of the child's location and how to contact him. CT Page 11130
18. The wife shall maintain medical insurance for the benefit of the minor child through her employment. The provisions of Section 46b-84(c) will apply.
19. Neither the husband nor the wife shall pay periodic alimony except as set forth in Paragraph 7 of these orders. The wife shall pay the husband the sum of forty thousand dollars ($40,000.00) as lump sum alimony within four months of this judgment.
20. The husband shall pay child support in the amount of $95.00 per week until the minor child has reached the age of eighteen or has graduated from high school, whichever is later, but in no event beyond the child's nineteenth birthday. This amount is based upon the child support guidelines taking into consideration the wife's actual income, the husband's earning capacity, and the husband's income from other sources including alimony. The court recognizes the unusual circumstance presented by this case, where one spouse is an obligee for purposes of alimony and an obligor for purposes of child support. The court calculated the wife's gross and net incomes as set forth on her financial affidavit. The court calculated the husband to have a gross income of $673.07, and a net income of $535.19 after deductions for taxes, social security, and medicare. The parties' combined net income is $1,620.00, leaving a support amount of $288.00, of which the husband is obligated for 33%. The court considered the deviation criteria but will not order a deviation. The parties will pay unreimbursed medicals in accordance with the child support guidelines based on these figures.
21. Each party will pay his or her own attorney fees.
Judgment will enter accordingly.
BY THE COURT,
GRUENDEL, J.